**JORDAN K. CAMERON (12051)**
  *jcameron@hjslaw.com*
**DURHAM, JONES & PINEGAR, P.C.**
3301 N. Thanksgiving Way, Suite 400
Lehi, UT 84043
Telephone: (801) 375-6600
Fax: (801)375-3865

*Attorneys for Plaintiff ZooBuh, Inc.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ZOOBUH, INC., a Utah Corporation<br><br>Plaintiff,<br><br>vs.<br><br>SAVICOM, INC., DBA MINDSHARE DESIGN, A California Entity; DG INTERNATIONAL LIMITED, a foreign entity domestically registered in Delaware,<br><br>Defendants. | **COMPLAINT**<br><br><br><br>Case No.: 2:17cv01098 JNP<br><br>Judge Jill N. Parrish |

COMES NOW Plaintiff ZooBuh, Inc. ("ZooBuh"), and complains and alleges the following:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff ZooBuh is a Utah Corporation with its principal place of business in Utah County, Utah, and at all relevant times hereto was duly registered and licensed to do business in the State of Utah.

2. Defendant Savicom, Inc., dba Mindshare Design ("Mindshare") is a California company. Mindshare transacts or has transacted business in this district sufficient to subject it to the jurisdiction of this Court.

3. Defendant DG International Limited ("DG International") is a foreign entity domestically registered in Delaware. DG International transacts or has transacted business in this district sufficient to subject it to the jurisdiction of this Court.

JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), for violations of the 15 U.S.C. §7701 *et seq.* (CAN-SPAM Act of 2003), and pursuant to 15 U.S.C. § 7706(g)(1) (original jurisdiction) for cases involving a civil action by an internet access service adversely affected by a violation of 15 U.S.C. §7704(a)(1), 15 U.S.C. §7704(b), or 15 U.S.C. § 7704(d), or a pattern and practice that violates subparagraphs (2), (3), (4), and/or (5) of 15 U.S.C. § 7704(a)

5. This Court has personal jurisdiction over the Defendants because the Defendants, and each of them, are residents of the state of Utah, are businesses organized and existing under the laws of the state of Utah, and/or because Defendants have purposefully availed themselves of the privileges of conducting commercial activity in the forum state, and the exercise of jurisdiction is reasonable since Defendants should have known that they would be subject to the jurisdiction and laws of the forum state when they sent, or had commercial emails sent to customers of an email service provider located in Utah.

6. Venue is proper pursuant to 18 U.S.C. §1391, as a substantial part of the unlawful actions by the Defendants, and each of them, occurred in this judicial district.

# GENERAL ALLEGATIONS

7. During all times relevant hereto, and through the date of the filing of this Complaint, ZooBuh was a corporation duly existing under the laws of the State of Utah which provided access to, and enabled and hosted email, chat, and blog services for private parties.

8. ZooBuh was first formed in 2002, prior to the existence of the CAN-SPAM Act.

9. ZooBuh is a widely and well recognized service provider of email, blog, and chat services.

10. ZooBuh has been featured in articles, published in *PC Advisor, PC Magazine, Tech World, The Guardian, Find it Quick Internet Guide,* and *Yahoo's Associated Content* and has been mentioned in the following books: How to Protect Your Children on the Internet, by Gregory S. Smith and CyberSafety, by Ken Knapton. ZooBuh has also been mentioned and/or featured on KSL News' Nanny Radio Show and WBTV.

11. ZooBuh owns all the servers, routers, and switches on its network through which it hosts and provides its Internet access services for its customers.

12. ZooBuh has an expansive network and infrastructure, which it has had to consistently update, upgrade and augment in order to combat ongoing spam problems.

13. ZooBuh is the sole owner of all its hardware, and has complete and uninhibited access to, and sole physical control over, the hardware.

14. As a legitimate email service provider, ZooBuh is a bona fide Internet Access Service ("IAS") as that is term defined under 15 U.S.C. §7702(11), 47 U.S.C. §231(e)(4).

15. Every one of ZooBuh's customer's email accounts is registered, hosted and serviced through ZooBuh's own hardware.

3
SLC_3439271.1

16. ZooBuh also provides each of its customers with their own web-based portal through which they access their selected web based services (e.g., email, blogs, chat, etc.).

17. ZooBuh designed, created, and controls the web-based portal.

18. ZooBuh stores the routers, switches, and servers in a leased office space which offers server rack space, redundant Internet connections, physical security, and climate controls.

19. The accounts hosted and served by ZooBuh include email accounts owned by third-party customers of ZooBuh, and also include email accounts owned by ZooBuh.

20. Between January 2016 and continuing through the date of this Complaint, ZooBuh has received a significant number of electronic-mail messages ("email") bearing the characteristics of unlawful spam.

21. In total Mindshare transmitted, or caused to be transmitted, over 97,000 commercial emails to Zoobuh servers in Utah, which included at least 73,030 emails promoting DG International products, services, and/or websites.

22. Similarly, DG International transmitted, or caused to be transmitted, over 91,000 commercial emails to Zoobuh servers in Utah, at least 73,030 of which were transmitted in concert with Mindshare.

23. The emails have the characteristics of unlawful spam and contributed to an overall spam problem suffered by ZooBuh.

24. The 73,030 emails that the Defendants transmitted in concert with each other could not have been sent without the involvement of both Defendants.

25. Each of the emails in question is a commercial message and contains commercial content.

4

26. The emails, and each of them, were received by ZooBuh on its mail servers located in Utah.

27. Mindshare created the platform used by DG International through which the emails were created and sent.

28. Mindshare offered the platform for use by DG International pursuant to a contractual relationship.

29. Mindshare users, such as DG International, do not actually draft the emails and click send, rather, they provide certain information that is then populated by Mindshare's platform, compiled into an email file and transmitted by the platform. Through this process, the actual transmission of the 73,030 commercial messages in question required action by both DG International and Mindshare.

30. Mindshare designed the form used for the email creation that calls for From names, From address, Compliance Preferences, Message Header Preferences, and Web Content Retrieval Preferences which include various pre-determined technical and creative components included in the emails. DG International provided the information.

31. Together, the information in Mindshare's form, and the information provided by DG International, combined to create a complete commercial email.

32. An email requires a sender domain in order to be transmitted between mail servers.

33. Emails cannot be sent without a sender domain.

34. With respect to at least 73,030 of the DG International emails, such were transmitted from email addresses with a domain suffix @ml00.net, which at all relevant times,

5
SLC_3439271.1

was registered, owned and controlled by Mindshare.

35. Not only did Mindshare create the mechanism that compiles the recipient data into an email file for transmission across the internet (all of which requires affirmative action), Mindshare took the separate affirmative action of registering domains from which to transmit the emails.

36. Another similar domain affirmatively registered by Mindshare for the same purposes is mb00.net.

37. Each of Mindshare and DG International took an active and material role in the creation and transmission of the email messages in question.

38. On information and belief, Mindshare made no effort to verify or confirm that the thousands of commercial emails sent through its systems by DG International complied with the CAN-SPAM Act, and therefore procured the emails.

39. As a procurer of the emails, Mindshare is liable for violations therein.

40. DG International operates online dating websites where users of its service can contact and communicate with other like-minded people over the Internet, typically for the express or implied purpose of developing personal, romantic, or sexual relationships.

41. A simple Google search for DG International reveals enormous amount of consumer complaints alleging that consumers were misled by DG International's marketing practices, including specifically, that they were lead to believe that real people wanted to engage in romantic encounters, only to find, after creating memberships though DG International's websites, that no real people actually existed.

42. As part of its marketing, DG International uses e-mail addresses to communicate with prospective consumers. For example, consumers may receive an e-mail from DG International that purport to be a "nudge" or a "flirt" from an actual member of the website being promoted.

43. In many instances, the communications consumers receive are not from actual users of DG International's online dating service, but rather are from "Virtual Cupids"—that is, fake users set up by DG International who communicates with consumers in the same way that actual users would. DG International sends these Virtual Cupid communications via e-mail in connection with the advertising, marketing, promotion, offering for sale, or sale of their online dating service.

44. To do this, with respect to at least 73,030 of the emails, DG International required the involvement and assistance of Mindshare.

45. Through these messages, DG International represented, directly or indirectly, expressly or by implication, that the email communications are from actual people interested in communicating with the recipients.

46. In truth and in fact, in numerous instances, the communications are not from actual people interested in communicating with the recipient, but instead are from computer generated virtual profiles created by DG International to drive traffic to its websites under false pretenses.

47. For example, 42 emails in question were purportedly sent from "Cassidy Wheeler". The emails were sent to various different recipients and each contained nearly identical information similar to the following: "Hi babe, would love to meet up this weekend for

a few drinks. I know a cool spot if you are interested. They serve good drinks and it's really "low key". Now that i'm single I'm looking to get out of the apartment more often and have some fun. Lately all I have been doing is working... no fun. So let me know if this sounds like something you are interested in..."

48. When the links in the emails are clicked, the recipient is sent to a registration page for one of DG International's websites.

49. Similarly, 92 emails were purportedly sent from "Crystal Hall" to provide an updated telephone number or explicit photos. The emails state, "Crystal has updated her contact info" And "You now have access to view her private pics."

50. As with the "Cassidy Wheeler" emails, the links in "Crystal Hall" emails direct the recipient to a registration page for one of DG International's websites.

51. As another example, over 400 emails were purportedly sent from "Dianna." When clicked, the emails from "Dianna" identify many different female names and provide links that directed the recipients to registration or promotional pages on DG International's websites.

52. In another example, nearly 3,000 emails were sent from a single email address and purported to come from many different women such as: Mandy Cooper, Nicole, Katherine Scott, Katie Jackson, Tammy Lawson, Michelle Morris, Amanda Cosgrove, Brittany, Kelly, Tiffany Love, Casey, Kelly and Gabrielle as examples. Each of the emails was a promotional message, disguised a coming from an actual woman seeking a sexual encounter.

53. Defendant DG International is liable for the CAN-SPAM violations in the emails as the "sender" of the emails in question, as defined in the CAN-SPAM Act, because its

8

products, services, and/or website is/are advertised in the email messages, and it either transmitted or procured the transmission of the emails in question.

54. The harm ZooBuh has suffered and continues to suffer, as the result of its collective spam problem is much more significant than the mere annoyance of having to deal with spam or the process of dealing with spam in the ordinary course of business (i.e., installing a spam filter to discard spam).

55. The harm ZooBuh suffered, and continues to suffer, is manifested in financial expense and burden significant to an ISP; lost employee time; lost profitability; the necessity to purchase and dedicate equipment specifically to process spam that could otherwise be dedicated providing internet access services; harm to reputation; and customer and email recipient complaints relating to spam generally.

56. Each of the emails in question violates one or more CAN-SPAM provisions.

57. The majority of emails received by ZooBuh, including the emails in question, violate the CAN-SPAM Act in one or more ways, and contributed to a larger spam problem.

FIRST CAUSE OF ACTION<br>**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(1)**

58. Each of the previous paragraphs is realleged herein.

59. The CAN-SPAM Act makes it unlawful to send email messages that contain, or are accompanied by, materially false or materially misleading Header Information. 15 U.S.C. §7704(a)(1).

60. Email headers can be materially misleading in many ways, including as examples when Header Information includes: false sender email accounts; false sender names; false sender email addresses; header information that is registered to unrelated third parties; altered or

9

concealed header information that impairs the ability of a party processing the message to identify or respond to the transmitting party.

61. At least 24,024 emails promoting DG International, many of which were sent with the assistance of Mindshare, contained false sender names purporting to be actual women.

62. As least 60,000 emails promoting DG international, many of which were sent with the assistance of Mindshare, contained false sender domains purporting to be actual online users such as "Addict2Bang", "BANGmeHARD", and "iBendover4U".

63. In each case, the email "from" names do not actually identify real people, but instead "Virtual Cupids" designed to entice the recipient of the email to open it and click the links under false pretenses.

64. The email headers are false and/or misleading because they purport to identify real people looking for real romantic relationships when in fact they are marketing messages sent from a company in an effort to gain customers.

65. Accordingly, ZooBuh prays for relief in the amount of $100 per violation of 15 U.S.C § 7704(a)(1) pursuant to 15 U.S.C. § 7706(g)(3).

SECOND CAUSE OF ACTION
**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(1)(A)**

66. Each of the previous paragraphs is realleged herein.

67. The CAN-SPAM Act makes it unlawful to send email messages that contain, or are accompanied by, materially false or materially misleading Header Information. 15 U.S.C. §7704(a)(1).

68. "Header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for

purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading." 15 U.S.C. § 7704(a)(1)(A).

69. An email that originated from a sender domain registered with an ICANN compliant domain registrar who maintains an anti-spam policy, violates the law regardless of whether the email contains a header that is technically accurate.

70. Here, at least 73,030 of the Mindshare/DG International emails were sent from domains registered with Network Solutions.

71. Network Solutions in an ICANN compliance domain registrar.

72. Network Solutions' *Acceptable Use Policy* specifically prohibits "Sending Unsolicited Bulk Email" which it identifies as "spam."

73. Mindshare registered the ml00.net domain for the sole purpose of using it within its platform to send bulk email, which is a direct violation of the Network Solutions policy.

74. DG International intentionally used the Mindshare platform to send thousands of emails (i.e. bulk email) with the ml00.net domain.

75. Each of the 73,030 emails violates the CAN-SPAM Act because each violates Network Solutions' anti-spam policy.

76. Further, the policy prohibits "Running Unconfirmed Mailing Lists." This is defined as "Subscribing email addresses to any mailing list without the express and verifiable permission of the email address owner . . ."

77. Many of the recipient email addresses do not actually pertain to real ZooBuh customers. Instead they appear to be email addresses which were auto-generated by the senders of the emails and designed to contain domains owned by ZooBuh. Therefore, ZooBuh is the

11

owner of the email address as its servers are the only recipients thereof. At no point in time has ZooBuh given permission for any email address containing and of its domains to be subscribed to any mailing list, and verifiable permission would be impossible for Mindshare and DG International to obtain. Nevertheless, the Defendants sent many emails to these addresses and ZooBuh received the emails on its servers.

78. Other recipient email addresses belong to minors under the age of 18 with whom Defendants could have not lawful communication, and similarly from whom, Defendants could obtain no verifiable consent.

79. The foregoing email addresses account for each of the 73,030 emails send from the domain registered with Network Solutions.

80. Each of the emails sent to unverified, purported subscribers, violates the Network Solutions' policy and therefore violates the CAN-SPAM Act.

81. The Network Solutions policy also prohibits the use of its services "to solicit customers from, or collect replies to, messages sent from another Internet Service Provider where those messages violate this Policy or that of the other provider."

82. ZooBuh's policy prohibits the use of its network for spamming purposes. The policy states, in part,, "Sending . . . commercial messages over the Internet (known as "spamming") is prohibited, regardless of whether or not it overloads a server or disrupts service to ZooBuh's customers. The term "spamming" also includes, but is not limited to, engaging in spamming using the service of another ISP, selling or distributing software through services ZooBuh provides. . . . ZooBuh reserves the right to determine, in its sole and absolute discretion, what constitutes a violation of this provision. A piece of mail is considered Spam when: Headers

12

and identifiers are altered in a manner of attempting to disguise or falsify the origin of the email[;] Relaying mail from a server that is not owned by yourself, or do not have permission to do so[;] Sending several messages that have the same body and/or subject to a mass list of people, whether it be at once (bcc) or individually[;] Sending advertising information without their explicit consent to receive such items[;] Sending chain letters, pyramid schemes, etc."

83. The emails in question were sent with the intent of soliciting customers in violation of ZooBuh's anti-pam policy, which is therefore a violation of Network Solution's policy. Accordingly, each email violates the CAN-SPAM Act.

84. Accordingly, ZooBuh prays for relief in the amount of $100 per violation of 15 U.S.C. § 7704(a)(1) pursuant to 15 U.S.C. § 7706(g)(3) for each of the 73,030 emails.

THIRD CAUSE OF ACTION<br>**CAN-SPAM ACT, 15 U.S.C. § 7704(a)(2)**

85. Each of the previous paragraphs is realleged herein.

86. The CAN-SPAM Act makes it unlawful for any person to "initiate the transmission to a protected computer of a commercial electronic mail message if such person has actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that a subject heading of the message would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message." 15 U.S.C. § 7704(a)(2).

87. Many of the Mindshare/DG International emails violate §7704(a)(2) in that the Subject Heading was misleading or likely to mislead a recipient about a material fact regarding the contents or subject matter of the email message (i.e., that an actual living person is attempting to communicate with the recipient for romantic purposes).

13

88. Accordingly, ZooBuh prays for relief in the amount of $25 per violation of 15 U.S.C. § 7704(a)(2) pursuant to 15 U.S.C. § 7706(g)(3).

## FOURTH CAUSE OF ACTION
**Aggravated Damages – CAN-SPAM Act 15 U.S.C §7706(g)(3)(C)**

89. Each of the previous paragraphs is realleged herein.

90. On information and belief, each of the Defendants committed the violations set forth above willfully and knowingly; or, in the alternative, each of the Defendant's unlawful activity included one or more of the aggravated violations set forth in 15 U.S.C. § 7704(b).

91. Specifically, Defendants knew that the "from" names did not identify actual, living people; and/or Defendants knew that the header and subject lines would create the appearance that a real person sent the email, when in fact, they were not send by actual people looking to connect romantically with the recipient.

92. Accordingly, ZooBuh prays for treble damages of the total damage amount determined by this Court.

## REQUEST FOR RELIEF

Plaintiff respectfully requests the following relief:

A. Entry of judgment in the amount of $100 per violation of 15 U.S.C. § 7704(a)(1).

B. Entry of judgment in the amount of $100 per violation of 15 U.S.C. § 7704(a)(1)(A).

C. Entry of judgment in the amount of $25 per violation of 15 U.S.C. § 7704(a)(2).

D. Treble damages pursuant to 15 U.S.C. § 7706(g)(3).

E. Attorneys' fees and costs pursuant to 15 U.S.C. § 7706(g)(4).

F. Pre and post-judgment interest at the highest rate permitted by law.

G. Entry of permanent injunction against each Defendant prohibiting each Defendant from sending or causing to be sent email message to ZooBuh and its customers.

H. All other relief deemed just in law or equity by this Court.

DATED this 29th day of September 2017.

DURHAM, JONES & PINEGAR, P.C.


/s/ Jordan K. Cameron
Jordan K. Cameron
*Attorneys for Plaintiff*

**Plaintiff's Address**
5406 W 11000 N
Ste 103, #166
Highland UT 84003
United States