IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ZOOBUH, INC., a Utah corporation,<br><br>         Plaintiff,<br>v.<br><br>SAVICOM, INC., dba MINDSHARE DESIGN, a California Entity [TERMINATED]; DG INTERNATIONAL, a foreign entity; DG INTERNATIONAL LIMITED, LLC, a Delaware entity; Sylvia van Baekel, an individual,<br><br>         Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR DEFAULT JUDGMENT**<br><br>Case No. 2-17-cv-01098<br><br>District Judge Jill N. Parrish |

This matter is before the court on the Motion for Default Judgment (ECF No. 49) against defendant DG International ("DG International") filed by Plaintiff ZooBuh, Inc. ("ZooBuh") pursuant to Fed. R. Civ. P. 55(b)(2). ZooBuh seeks statutory damages and treble damages against DG International for its alleged violations of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (CAN-SPAM Act), 15 U.S.C. § 7701 *et seq*. After reviewing the motion for Default Judgment, the court issued an order requesting that ZooBuh submit additional briefing on the issue of damages. ZooBuh thereafter filed its Supplemental Brief Regarding Statutory Damages Calculation ("Supplemental Brief", ECF No. 71).[1] The court now rules on ZooBuh's motion.

---

[1] Although ZooBuh's Supplemental Brief asks the court to award damages against DG International and DG International Limited, LLC ("DGI LLC"), ZooBuh does not have a pending motion for default judgment against DGI LLC and thus those claims are not before the court.

## BACKGROUND

ZooBuh is a Utah corporation with its principal place of business in Utah County, Utah. ZooBuh provides email services to its customers, and it owns all of the servers, routers, and switches on its network. Every ZooBuh email account is registered, hosted, and serviced through ZooBuh's hardware.

DG International is a foreign company located in Basseterre, St. Kitts. DG International contracted with DG International Limited, LLC ("DGI LLC"), a Delaware limited liability company, to send emails to persons on DG International's customer lists. The customer list at issue in this case contained email addresses for persons who had supposedly registered for the dating website xdating.com. DGI LLC used the platform of Savicom, Inc., dba Mindshare Design ("Mindshare")[2] to send email advertisements to the email addresses associated with the xdating.com customer list.[3]

Zoobuh alleges that it and its customers have received thousands of email advertisements for xdating.com. All of these emails arrived on Zoobuh's email servers, which are located in Utah. The emails contain links to a registration page for xdating.com. Many of the emails contain misleading information: they purport to identify people registered on xdating.com, but in reality the people identified in the emails do not exist and are not users of xdating.com. Rather, the emails are sent from "virtual cupids": fake users created by DGI LLC and/or DG International who communicate with users in the same way actual users would. As xdating.com's terms and conditions explain:

---

[2] ZooBuh and Mindshare stipulated to the dismissal of Mindshare on August 15, 2018.

[3] This information is undisputed. *See* Declaration of Sylvia Van Baekel (Baekel Dec.) at ¶¶ 8-10.

> THIS SITE USES FANTASY PROFILES CALLED "ONLINE FLIRT®" In order to enhance your amusement experience, to stimulate you and others to use our Services more extensively, and to generally sprinkle some sparkle and excitement into the Services of XDATING.COM, we may post fictitious profiles, generate or respond to communications by means of automated programs or scripts that simulate or attempt to stimulate your intercommunication with another real human being (though none really exists and any dialog is generated by programming) . . . .

Many of the emails at issue are tailored to the recipient's location, in this case, Utah. Some of the emails state, "Hey there [username], these are few [sic] members we've selected for you near Salt Lake City." The emails identify supposed members of xdating.com living in Salt Lake City, Ogden, Sandy, West Jordan, Cedar Valley, West Valley City, Provo, Midvale, Spanish Form, Orem, and Murray—all cities in Utah. But the members identified whose usernames range from "bigbootylicious" to "sassyhottie37," appear to be virtual cupids only. Many images are reused with different usernames and ages.

According to ZooBuh, neither it nor its customers elected to receive email advertisements for xdating.com. Rather, ZooBuh believes that its customers are being opted-in to receive emails from xdating.com when, in actuality, the customers are attempting to unsubscribe from xdating.com's email list. Specifically, ZooBuh has an auto-unsubscribe feature that does not distinguish between unsubscribe links and marketing links. As such, the auto-unsubscribe "follows all links." This, according to ZooBuh, has inadvertently resulted in ZooBuh customers being added to the xdating.com customer list.

ZooBuh alleges that all of the emails at issue violate at least one or more provisions of CAN-SPAM. ZooBuh alleges that it has suffered harms to its business, including financial harm, lost time, and server crashes. ZooBuh regularly receives customer complaints concerning spam email, and some customers have stopped using ZooBuh because of the spam emails.

DG International was served March 29, 2018. *See* ECF No. 44. DG International did not file an answer or otherwise respond, and the clerk of court subsequently issued a certificate of default as to DG International. ECF No. 48. ZooBuh originally sought a judgment in the amount of $15,705.400 against DG International for an alleged 84,024 violations of 15 U.S.C. § 7704(a)(1) and for an alleged 73,030 violations of 15 U.S.C. § 7704(a)(1)(A) pursuant to 15 U.S.C. § 7704(g)(3). After ZooBuh filed its motion for default judgment, on June 8, 2018, the court dismissed ZooBuh's second cause of action seeking damages for violations of 15 U.S.C. § 7704(a)(1)(A). The court then requested supplemental briefing on how to calculate statutory damages under 15 U.S.C. § 7706(g). On August 17, 2018, Zoobuh filed its Supplemental Memorandum wherein it claims $12,603,600.00 in damages for the 84,024 alleged violations of 15 U.S.C. § 7704(a)(1).[4]

## ANALYSIS

ZooBuh moves the court pursuant to Fed. R. Civ. P. 55(b)(2) to enter a default judgment against DG International for its violations 15 U.S.C. § 7704(a)(1). ZooBuh has obtained a default certificate against DG International as required by DUCivR 55-1(a). The court now must address first whether it has jurisdiction[5] over this case and second whether ZooBuh is entitled to the relief it seeks.

### A. PERSONAL JURISDICTION

The court has subject matter jurisdiction over the case under 15 U.S.C. § 1331 (federal question doctrine) and 15 U.S.C. § 7706(g)(1) (authorizing original jurisdiction), but the court

---

[4] This is a base amount of $4,201,200.00 ($50 per violation) times treble damages under 15 U.S.C. § 7706(g)(3)(C).

[5] [W]hen entry of a default judgment is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties." *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986).

must still address whether it may exercise personal jurisdiction over DG International before it may enter a default judgment against it.

ZooBuh alleges that the court has personal jurisdiction over all the defendants "because each of them has purposefully availed themselves of the privileges of conducting commercial activity in the forum state." Am. Compl. ¶ 7. ZooBuh alleges that there is personal jurisdiction over DG International specifically because it "transacts or has transacted business in this district sufficient to subject it to the jurisdiction of this Court." *Id.* at ¶ 4. What is more, ZooBuh alleges that "the exercise of jurisdiction is reasonable since Defendants should have known that they would be subject to the jurisdiction and laws of the forum state when they sent, or had commercial emails sent to customers of an email service provider located in Utah." *Id.* at ¶ 7.

Although the court has already held that it may exercise personal jurisdiction over DGI LLC, DG International is a separate foreign entity whose contacts with the state of Utah were not addressed in the court's Memorandum Decision and Order granting in part and denying in part Sauvicom and DGI LLC's Motion to Dismiss ("Order on Motion to Dismiss"), ECF No. 50. But the analysis is essentially the same because DG International is alleged to have acted concurrently with DGI LLC in sending the infringing emails. The court therefore incorporates the Order on the Motion to Dismiss herein, but briefly addresses the issues as applied to DG International. *See* Or. Mot. Dismiss at 4–17.

The CAN-SPAM does not provide for nationwide service of process, so Rule 4(k)(1)(A) instructs this court to apply the law of the state in which the court sits. *Zoobuh, Inc. v. Williams*, No. 2:13-CV-791-TS, 2014 WL 7261786, at *2 (D. Utah Dec. 18, 2014) (applying Utah's long-arm statute to analyze personal jurisdiction because CAN-SPAM does not authorize nationwide service of process). Consequently, Utah law governs personal jurisdiction in this case. *See id.*

5

Utah's long-arm statute extends jurisdiction over defendants "to the fullest extent permitted by the due process clause of the Fourteenth Amendment." Utah Code Ann. § 78B-3-201(3). As such, the personal jurisdiction analysis in this case involves a single inquiry: whether the exercise of jurisdiction over the defendant comports with the due process clause. *See Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (holding that personal jurisdiction analysis required a single due process inquiry because Colorado's long-arm statute extends jurisdiction to the Constitution's full extent). Under the due process clause, a court may exercise jurisdiction over a defendant so long as: (1) the defendant purposefully established "minimum contacts" with the forum state, and (2) the assertion of personal jurisdiction comports with fair play and substantial justice. *Id.* A defendant's contacts, depending on their quality and quantity, may give rise to either general or specific jurisdiction. *Id.*

1. **General Jurisdiction**

A court may exercise general jurisdiction when an entity's contacts with the forum state are "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). A corporation is considered "at home" in its place of incorporation and its principal place of business. *Id.* at 924. But this is a "high burden" and one that ZooBuh has failed to meet. *See* Or. Mot. Dismiss at 6–7 (quoting *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004)).

2. **Specific Jurisdiction**

In the absence of general jurisdiction, the court may exercise specific jurisdiction over the defendant if due process will be satisfied. This requires analyzing the due process factors of 1) "whether the plaintiff has shown that the defendant has minimum contacts" with the forum and 2) whether "the defendant has presented a 'compelling case'" that the exercise of jurisdiction does

not comport with fair play and substantial justice. *Old Republic*, 877 F.3d at 904 (quoting *Shrader v. Biddinger*, 633 F.3d 1235, 1240 (10th Cir. 2011)).

### a. Minimum Contacts

A defendant has minimum contacts with the state if (1) the defendant "purposefully directed its activities at residents of the forum state," and (2) the plaintiff's injuries "arise out of the defendant's forum-related activities." *Old Republic*, 877 F.3d at 904 (quoting *Shrader*, 633 F.3d at 1239). In its Order on the Motion to Dismiss, the court found that DGI LLC had minimum contacts with Utah because DGI LLC purposefully directed its conduct at Utah by (1) committing an intentional act of sending emails to the xdating.com customer list, (2) that was expressly aimed at Utah because the emails included Utah place names and "identified" members of xdating.com living in Utah cities; and (3) DGI LLC knew that the brunt of the injury would be felt in Utah because it personalized the emails to Utah residents. Or. Mot. Dismiss at 11–14.

ZooBuh alleges that DGI LLC and DG International sent the emails in concert. Although DG International has not appeared, DGI LLC admitted sending the emails on behalf of DG International. Thus, the same analysis applies to DG International as applies to DGI LLC. First, DG International contracted with DGI LLC to send the emails and may have sent emails itself, thereby committing an intentional act. DG International's name and address appear as the sender of the emails in all of the emails provided by ZooBuh. Second, DG International targeted Utah by sending the emails personalized to reference Utah place names and Utahans. Third DG International knew the brunt of the harm would be felt in Utah because the emails all contain links to subscribe that would be used by the recipients of the emails in Utah. Finally, ZooBuh's injuries in this case arise out of DG International's emails that were purposefully directed at Utah. In conclusion, DG International has minimum contacts with Utah.

7

### b. Fair Play and Substantial Justice

Because DGI International has minimum contacts with the state of Utah, the court may exercise jurisdiction over the defendant unless the defendant presents a "compelling case" that the presence of some other consideration renders jurisdiction unreasonable. *Old Republic*, 877 F.3d at 908–09. But "it is incumbent on defendants to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1080 (10th Cir. 2008)). DG International has not answered the complaint, and thus the court finds that it has not met its burden. The court may therefore exercise personal jurisdiction over DG International, a properly joined defendant.

### B. CLAIM FOR RELIEF UNDER 15 U.S.C. § 7704(a)(1)

The court now addresses whether ZooBuh has standing to bring a claim for relief under 15 U.S.C. § 7704(a)(1) and then addresses whether ZooBuh has successfully established that it is entitled to the relief it seeks.

#### 1. Standing

To bring private action to enforce the CAN-SPAM Act, ZooBuh must have statutory standing. *See Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1049 (9th Cir. 2009).[6] Under 15 U.S.C. § 7706(g)(1), "[a] provider of Internet access service adversely affected by a violation of section 7704(a)(1) . . . of this title, may bring a civil action in any district court of the United States with jurisdiction over the defendant." The question of standing involves two questions: "(1) whether the plaintiff is an 'Internet access service' provider . . . and (2) whether the plaintiff was 'adversely affected by' statutory violations." *Gordon*, 575 F.3d at 1049; *see also XMission, L.C. v. Trimble*,

---

[6] The court relies on *Gordon* for its persuasive value as the Tenth Circuit has yet to address standing under the CAN-SPAM Act.

No. 2:17-CV-00013, 2018 WL 5045236, at *2 (D. Utah Aug. 24, 2018), *report and recommendation adopted,* No. 2:17-CV-13, 2018 WL 5044237 (D. Utah Oct. 17, 2018).

The CAN-SPAM Act defines "Internet access service" as "a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. Such term does not include telecommunications services." *See* 15 U.S.C. § 7702(11) (cross-referencing 47 U.S.C. § 231(e)(4)). ZooBuh alleges that it is a "service provider of email, blog, and chat services." ZooBuh also "owns all the servers, routers, and switches on its network through which it hosts and provides its Internet access services." Am. Compl. ¶ 13. The court finds that ZooBuh is an Internet access service provider within the meaning of 15 U.S.C. § 7706(g)(1).

Although "[t]he CAN–SPAM Act itself does not delineate the types of harm suggested by the 'adversely affected by' language," other courts have "concluded that the harm 'must be both *real* and *of the type uniquely experienced by* [internet access service providers] for standing to exist." *Gordon*, 575 F.3d at 1053 (emphasis in the original) (quoting *Gordon v. Virtumundo, Inc.*, No. 06-0204-JCC, 2007 WL 1459395, at *7 (W.D. Wash. May 15, 2007), *aff'd*, 575 F.3d 1040). In *Gordon*, the Ninth Circuit held that being "forced to wade through thousands of e-mails" that "clogged" the plaintiff's servers did not constitute actual adverse effects without evidence that there were costs associated with the annoyance. *Gordon*, 575 F.3d at 1055. In its complaint, ZooBuh alleges that the harm caused by the emails has "manifested in financial expense and burden significant to an [Internet service provider]" including "lost employee time; lost profitability; the necessity to purchase and dedicate equipment specifically to process spam . . .; harm to reputation; and customer and email recipient complaints." Amend. Compl. ¶ 60. As

ZooBuh has successfully pled that it was harmed by DG International's behavior in a way that is unique to Internet service providers, the court finds that ZooBuh has standing to bring a claim under the CAN-SPAM Act.

### 2. Did DG International Violate 15 U.S.C. § 7704(a)(1)?

Under 15 U.S.C. §7704(a)(1):

> It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading.

First the court must address whether DG International "initiat[ed] the transmission, to a protected computer, of a commercial electronic mail message." *Id.* Then the court must determine whether those emails messages "contain[], or [are] accompanied by, header information that is materially false or materially misleading." *Id.* The final issue is damages.

#### a. DG International Initiated Emails

The CAN-SPAM Act states that "the term 'initiate,' when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message." 15 U.S.C. §7702(9). Additionally, "more than one person may be considered to have initiated a message." *Id.* In this case, ZooBuh has alleged that DG International both directed DGI LLC to send emails to ZooBuh customers and sent emails itself. DGI LLC has admitted to sending emails on DG International's behalf. Thus, whether or not DG International personally sent emails, by directing DGI LLC, DG International has "procur[ed] the origination or transmission" of email messages and thus has "initiated" emails within the definition of the statute.

### b. Materially False Header Information

"The CAN–SPAM Act 'does not ban spam outright, but rather provides a code of conduct to regulate commercial e-mail messaging practices.'" *Facebook, Inc. v. Power Ventures, Inc*., 844 F.3d 1058, 1064 (9th Cir. 2016) (quoting *Gordon*, 575 F.3d at 1047–48). To violate 15 U.S.C. § 7704(a)(1) the emails must contain header information that is "materially false" or "materially misleading." 15 U.S.C. § 7704(a)(1).

#### i. Header Information

To constitute a violation of 15 U.S.C. §7704(a)(1), the false information must be contained in the header information. "Header information" includes "the source, destination, and routing information attached to an electronic mail message [("email")], including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message."15 U.S.C. § 7702(8). The "line identifying a person initiating the message" is the "From" line on an email. It can contain both the email address and other names that may identify the sender. The "electronic email address" itself is split into two parts: the username or mailbox (the "local part") and the originating "domain name." 15 U.S.C. § 7702(4)–(5). For example, in the email "John_Smith@notarealemail.com," the local part is "John_Smith" and the originating domain name is "notarealemail.com."

#### ii. Materially False or Misleading

In defining materially false or misleading, 15 U.S.C. § 7704(a)(1) provides in relevant part[7] that:

> (B) a "from" line (the line identifying or purporting to identify a person initiating the message) that accurately identifies any person

---

[7] The court has already found that ZooBuh failed to state a claim for relief under 15 U.S.C. § 7704(a)(1)(A).

> who initiated the message shall not be considered materially false or materially misleading; and
>
> (C) header information shall be considered materially misleading if it fails to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message for purposes of disguising its origin.

And 15 U.S.C. § 7704(a)(6) provides that:

> the term "materially," when used with respect to false or misleading header information, includes the alteration or concealment of header information in a manner that would impair the ability of an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

### 3. ZooBuh's Claim for Relief

ZooBuh alleges that DG International initiated at least 24,024 emails promoting DGI LLC and/or DG International all of which contained false sender names purporting to be actual women. For example, Zoobuh provides an email that in the sender line contains the name "Cassidy Fox," and the email address "XDmembers@reply.m100.net." ECF No. 33-1 at 94. But Cassidy Fox is not a real person. Because the email identifies a false sender, the header information is materially false or misleading in accordance with 15 U.S.C. § 7704(a)(1)(B). [8] ZooBuh is entitled to judgment on the 24,024 emails identifying a false sender.

ZooBuh also claims that 60,000 emails contained false sender domains purporting to be online users such as "Addict2Bang", "BANGmeHARD", and "iBendover4U." But usernames are not domain names. The domain name is part of the email address. For example, "xdating.com"

---

[8] An email is NOT materially false if it "accurately identifies any person who initiated the message," conversely, falsely identifying a person who sent the message is false and misleading.

and "dgmailservice.com" are domain names. "Addict2Bang" and BANGmeHARD" and other such usernames are not domain names. ZooBuh could have alleged that the usernames were used as the "local part" of the email address or were otherwise included in the sender information line to disguise the person sending the email, but ZooBuh did not. In fact, in all of the email examples provided by ZooBuh, these types of usernames appear only within the body of the emails. *See* ECF No. 33-1 at 42–68. And to state a claim under 15 U.S.C. § 7704(a)(1), the false user information must be included in the sender line. Thus, ZooBuh is not entitled to judgment under the act on these 60,000 emails. ZooBuh is only entitled to judgment for 24,024 violations of 15 U.S.C. § 7704(a)(1).

### 4. Damages

Zoobuh claims statutory damages[9] of $50 for each of the 84,024 alleged violations of 15 U.S.C. § 7704(a)(1) as well as treble damages under 15 U.S.C. § 7706(g)(3)(C) for a total sum of $12,603,600.00.[10] But ZooBuh is not entitled to this amount. ZooBuh is only entitled to damages for the 20,024 violations of 15 U.S.C. § 7704(a)(1) as discussed above. Additionally, the court must exercise its discretion in deciding the base amount per violation and whether to award treble damages.

#### a. Statutory Damages

Under the CAN-SPAM Act, Statutory Damages are calculated by "multiplying the number of violations (with each separately addressed unlawful message . . . treated as a separate violation) by up to $100, in the case of a violation of [15 U.S.C.] section 7704(a)(1)." 15 U.S.C.

---

[9] The Statute authorizes "actual monetary loss" or Statutory damages. 15 U.S.C. § 7706(g)(1)(B). ZooBuh has elected statutory damages.

[10] ZooBuh originally claimed $100 per violation, but lowered this to $50 per violation in its Supplemental Memorandum.

§ 7706(g)(3)(A). Although the statute establishes that there is no limitation on the amount of damages that may be awarded for violations of 15 U.S.C. § 7704(a)(1) (*see id*. at (g)(3)(B)), the statute offers no guidance on what amount, from $.01 to $100, the court should award per violation.

Because the statute rests discretion in the court, "[t]he court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." *Facebook, Inc. v. Wallace*, No. C 09-798 JF (RS), 2009 WL 3617789, at *2 (N.D. Cal. Oct. 29, 2009) (alteration in original) (quoting *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc*., 259 F.3d 1186, 1194 (9th Cir. 2001)). But "a statutory damages award may violate the due process rights of a defendant 'where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.'" *Id.* (quoting *United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir.1992)).

While the court certainly can award the full $100 per violation, many courts have chosen to award only $50 per violation, finding that amount sufficient and not excessive to "address the deterrent and punitive purposes of a statutory damages award." *Yahoo! Inc. v. XYZ Companies*, 872 F. Supp. 2d 300, 308–09 (S.D.N.Y. 2011) (citing *Facebook, Inc. v. Fisher et al.,* No. C 09–05842 JF (PSG), 2011 WL 250395 (N.D. Cal. Jan. 26, 2011) (awarding $50 per violation) and *Facebook v. Wallace,* 2009 WL 3617789 (same)). The court in *Yahoo!* chose to limit the damages to $50 per violation to limit the size of the award. In *Facebook v. Fisher*, 2011 WL 250395, at *2, the court considered the defendants' culpability and their willful and knowing violations of the statute and then limited the damages to $50 per violation because of the resulting size of the award..

Some courts however have chosen to award even less, especially when defendants sent a lesser quantity of emails. For example, in *Tagged, Inc. v. Does 1 Through 10*, No. C 09-01713 WHA, 2010 WL 370331, at *11–12 (N.D. Cal. Jan. 25, 2010), the court awarded only $25 per

14

violation of CAN-SPAM because the defendants had only sent 6,079 emails and the plaintiff had given "no estimates of actual damages." Meanwhile in *Asis Internet Servs. v. Rausch*, No. 08-03186 EDL, 2010 WL 1838752, at *7 (N.D. Cal. May 3, 2010) the court awarded only $25 per violation of 15 U.S.C. § 7704(a)(1) and $10 per violation of 15 U.S.C. § 7704(a)(2), finding the case analogous to *Tagged*.

Here, the court must balance the nature of the harmful behaviors with the size of the award. DG International appears to have willfully engaged in a scheme to send fraudulent emails to Utah citizens, causing harm to ZooBuh and ZooBuh's customers. DG International is alleged to have sent tens of thousands of emails, and although only 20,024 are at issue here, that number is certainly more significant than the 6,079 sent in *Tagged, Inc*, and is only a limited sample of the total emails sent. The court therefore finds that an award of $50 per violation is appropriate and sets the base award amount at $1,001,200.00.

### b. Aggravated Damages

Under 15 U.S.C. § 7706(g)(3)(C):

> The court may increase a damage award to an amount equal to not more than three times the amount otherwise available under this paragraph if— (i) the court determines that the defendant committed the violation willfully and knowingly; or (ii) the defendant's unlawful activity included one or more of the aggravating violations set forth in section 7704(b) of this title.

Aggravated violations include: "(1) address harvesting and dictionary attacks"; "(2) automated creation of multiple electronic email accounts"; and "(3) relay or retransmission through unauthorized access." 15 U.S.C. § 7704(b)(1)–(3). ZooBuh alleges that DG International acted willfully and intentionally and that DG International used "automated programs or scripts" in drafting the emails. ZooBuh has also alleged that DG International used address harvesting techniques to unwillingly subscribe ZooBuh customers to the list. The court finds that aggravated

damages should be awarded in light of evidence of automated process and willfulness. *See XMission, L.C. v. Trimble*, 2018 WL 5045236, at *8. Thus ZooBuh is entitled to a statutory award of $3,003,600.00.

## ORDER

The court hereby **GRANTS IN PART AND DENIES IN PART** ZooBuh's motion for default judgment against Defendant DG International. Default Judgment shall be entered in favor of ZooBuh and against DG International[11] in the amount of $3,003,600.00 on ZooBuh's claim under 15 U.S.C. § 7704(a)(1).

Signed March 8, 2019

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

---

[11] This judgment is as to DG International ONLY and NOT against DG International Limited LLC.